Good morning. May it please the Court, my name is William Crosby. I am co-counsel with Brian Wendler on both of these cases. I will be arguing on behalf of Mr. Russell. I would like to reserve three minutes, if I may. As with the other drivers that Mr. Wendler described, Mr. Russell was a long-haul truck driver for the company, having been employed for 23 years solely as an employee. When he attended a meeting in late 2006, presided over by Randy Diggs, who was the terminal manager at the time, and in this meeting, as Your Honor saw from the brief, there were representations made of long-term employment and a partnership arrangement. They were also told that they would have maintenance performed on the truck at discounted rates. Those are significant because even if the Court accepted what the District Court said about the affidavit of Mr. Russell being sham, it's undisputed in both the briefs that those representations that I just described were made. That was stated in Mr. Russell's deposition. So in analyzing the three issues that were addressed by the District Judge in his order, one, that there are nine elements of fraud, as the briefs have stated under Missouri law, and that two of those elements the District Court found there were not tribal issues, which the appellant strongly urges there are tribal issues. And I want to address that issue first, and that is that with respect to the speaker, Mr. Biggs, making a misrepresentation and the District Court's opinion stating that, well, he didn't know whether the 30-day termination clause would ever be invoked, I would first submit that it's not so much what Mr. Biggs thought, but what the company, whoever drafted that agreement, thought and what they instructed him to say to the drivers. And this sort of dovetails into the next issue, which has to do with the right of the reasonable reliance. And as the case that we both cited, it's kind of a standard case under Missouri law, Renaissance Leasing says that, first off, that it's a question of fact for the jury whether there's reasonable reliance, and that that has to be assessed from the perspective of the person who's claiming that he relied reasonably under all the circumstances and from the perspective of that person. And I would submit that certainly under these circumstances would be a jury issue. I guess the key issue here that I would suggest should be given attention to is, was the District Court's opinion that whether or not that 30-day termination clause would ever be invoked, the fact that Mr. Biggs, or presumably the company at that time, in better economic conditions than two years later, that's really not the issue. I'd like to analogize to the employment context in which an executive, say, is going to work for a big company and he needs the assurance that he's going to have some security, at least for a minimal period, whether it's three years, two years, five years, whatever. And in this case, these drivers had never done anything of this type before in the sense of any entrepreneurial ventures or business, and they were asked to buy trucks at a great expense, none of whom could afford to pay cash, and they made a down payment, and they were locked into, in most cases, five years or more payments. Now, if they said there was a partnership, then shouldn't there be some consideration given to the interest of the employee? And they cited a case that said, well, an employee relationship is not a fiduciary relationship. Could I interrupt you for a minute? I don't understand. Mr. Russell's case seems to be different than the other cases because he signed a second lease and bought a more expensive truck. Right. And so there's a Missouri case that's an old case, 1910 case, that suggests it's Brown v. Joplin. I think that's the case that suggests that if you enter into a subsequent contract and now you've had the opportunity to review the original contract, you've had the opportunity to assess the facts that maybe were fraudulent, and you go ahead and make a new agreement, that you're giving up those claims. That seems to be still good law. And so why doesn't that make all of this go away? The Brown v. Joplin case was a 1910 case, over 100 years old. That's the only authority they had for the proposition where this gentleman, the plaintiff, had paid $3,000, which was a lot more money in those days. We'll acknowledge that. And yet the equity of this situation is such that had they not, had Mr. Russell not been induced into the first contract by the assurance that he would be given at least the consideration that the company would if they fell on hard times, that they'd consider the fact that there might be a foreclosure, that these people might have to go bankrupt or whatever if they had to make payments on a debt, which they couldn't afford to pay anymore because they'd been terminated. But you're asking, are you just asking this court to ignore the Brown v. Joplin case? No, I think it's a century-old case, and I think that it's the only case at all that's on point to that issue. And I think that it's a date. Are there cases in other jurisdictions that are similar? Or is this the only other case? What would the restatement say about this? The only other case they cited in support of that position was Peck v. Jadwin, I think, which is, which didn't have the detrimental reliance of the payment. It was just somebody signed another promissory note that was similar to the first promissory note. If those are all the circumstances, then one could say, well, you did that knowingly. But at this point in time, especially when the company had reneged on its promise to do maintenance work and his bearings went out when he's going up the grapevine and here he needs a new truck. So what's he going to do? He had to get a new truck. And they characterized it, well, a Cadillac. He had to get a better quality truck because he knew by this time that they weren't going to do maintenance on the truck. Is there anything in the restatement on this kind of situation, the 1910 Missouri case? I have not found any case that overruled that particular case. Is there anything in the restatement of contracts that would bear on this issue, which might be helpful? Well, just. . . Not that you're aware. Not that I know of offhand. But. . . Is this contract. . . I'm having trouble with the relationship of this case to the first case. Is this the same contract? It's essentially the same contract. Same provision. Right. And the arbitration issue was not raised in this one? No, because this case was removed to federal court and they waived their right to compel arbitration. The Alvarado cases were filed later. But I would like to just point out one distinction they made in their briefs. They said, well, this is a future event. And the case law they cited, the Stevens case and the Hess case, said if it's a future event, that's not. . . You know, you can't claim that he knew it would be wrong. But the difference here is he knew, Mr. Beggs presumably knew, that the contract didn't provide for maintenance. And he also. . . It didn't provide for maintenance. And yet they kept that contract from Mr. Russell and the other drivers. They even kept it from the union. So why wouldn't they show him the contract until after they'd bought the truck and there was no turning back? Now that, to me, is. . . I mean, that is evidence of fraud. It's just not failure to perform. It's deceitfully keeping the very document that would cause them to not want to go through this. When the company needed these drivers, presumably because of their own credit risk, they needed these drivers to buy these trucks. So I think that the right to rely and the knowing misrepresentation, there are tribal issues. The district court erred in that. And this case should be remanded for that purpose. With respect to the protective order, that was an issue that came up during the litigation when the court reporter happened to be sitting at the end of the table and was visibly, appeared to be working on her transcripts and notes. And defense counsel then subpoenas her for a deposition to find out what I'm talking to my client about during a break. And I would only submit that of the cases that are cited, the San Francisco v. Superior Court case, which says that if the person is there to promote the client's interest, that that's not a waiver. And if their court reporter isn't there to promote everybody's interest, I don't know who is. The court reporter is there for one reason, to assure the integrity of the proceedings and to make sure there's a clear record. And for a reporter to be subpoenaed to find out what somebody may have talked about during a break, I think undermines the integrity of the process. It puts the court reporter on the spot of being accused of being a spy or not being credible herself. When there's no court reporter to find out what was said, she's not taking notes. So I just submit that. Let me bring you back to the fraud claim for a minute. So if I understand it correctly, under Missouri law, there's a knowledge requirement. That is, you have to prove that the employer knew that the statement that we want this to be a long-term contract to be untrue at the time that it was made. Now, the district court found that the employer did want it to be a long-term contract and had that desire. And interestingly, it was Mr. Russell that appeared to testify in his deposition that he didn't really understand it to be a long-term commitment. Now, there was this affidavit submitted, which the court found to be a sham affidavit. But between those two things, why, putting aside the second lease issue and the Joplin case, why isn't that enough to rule in Pacific's favor on this? Well, because he did say in his deposition, and maybe he was somewhat naive to say that he thought it would last forever, but his belief really on that point, I mean, he certainly didn't say I was on notice that this might be terminated on 30 days' notice. I think the key distinction is that in the district court's opinion, it said the fact that it had a 30-day termination clause that wasn't disclosed is not material because they didn't know whether they would be exercised. And again, I just would argue that just as an executive wants a contract, it's not an at-will contract. This is like an at-will subject to 30 days' notice, and it totally shifts the burden back to the employee who thinks that he's going into a partnership and they're going to consider his interest, the fact that he's going to suffer a tremendous. I guess my question is, this is summary judgment. What's the material fact that's in dispute? What is the disputed issue of fact that you can point to that the employer had the knowledge that the employer must have that this is not a true statement? Okay, two things. One is that he knew that there was a 30-day termination clause in this contract or whoever. He being? Randy Biggs. Biggs? Yes, or whoever. Had he seen the contract? Sure. Oh, well, sure. Biggs is very specific, right? Whether he was the terminal manager who explained the program to the drivers. But whether he did or not. Had the contract been drafted at that point? I'm sorry? Had the contract been drafted at that point? Yes. They claimed that because it had confidential information that the drivers shouldn't see it until they took delivery of the truck. And do we know the Biggs had seen the contract, or was he just told about provisions, or what? Well, he presumably knew about the provisions. Well, presumably he's probably not enough to get us here. Okay. Well, I would assume that they had the contract at that point in time. But why would we assume that? I mean, what does the record show? If we don't know what the record shows, then we should just say we don't know. But what does the record say? Even if he didn't, I can't represent to Your Honor that I know for sure that he had seen the contract. But he was supposed to be explaining its terms. I'm sorry? Was he explaining its terms? Was that what he was doing? No, he just presented it in general terms to the drivers. And he said it was going to be a long-term deal, and we're going to be partners in this arrangement. And the evidence that that's untrue, so far the only thing you've mentioned is the language in the contract itself about the 30-day termination provision. Is there any other evidence in the record that he knew that to be untrue when he said it? I should have added he also said, and we're going to perform maintenance on the trucks, the company will at reduced rates. And that was very material to Mr. Russell because that is costly. And, in fact, when they didn't provide maintenance later on, that's why he had to buy the second truck. How does that show knowledge of the statement about long-term relationship being untrue? Because the contract doesn't say anything about maintenance on the truck. So there's two issues. If the contract says that it's not going to provide maintenance, where does he get off saying they are going to provide maintenance and then not letting them see the contracts until they take delivery of the trucks several months later? So whether he knew or not, he made that statement with reckless disregard of the truth. He should at least have read it if he's going to make that affirmative statement to these employees. Okay. You have 20 seconds. We took you over your three minutes to reserve. I will allow you a minute for rebuttal. I defer to you. As the court noted, this is a summary judgment case. I wanted to state, first of all, that the district court noted that this is a case in which it's somewhat unusual that there seems to be some challenge with actually stating what someone's testimony is or what was stated in the record. The summary judgment motion was based primarily on Mr. Russell's own testimony, a lengthy deposition in which he testified that prior to deciding to become an owner-operator and enter into the lease, he attended only one meeting. It was a meeting in 2006 or 2007 at which Mr. Beggs was the only speaker and generally announced the fact that PMT was going to have an owner-operator program. It is important, and I'll come back to this point that I mentioned in the last case, and that is Mr. Russell also attaches to his complaint Article 63 of the Western Supplement, and in Section 10C, and it's difficult to read on the attachment, the very first few words of that section are, should the employer cancel the lease of any owner-operator? And then it goes on from there. The notion that there was some 30-day clause really is getting at the fact that Mr. Russell claims that PMT did not have the right to cancel the lease. That's really what he's after. And this section of the collective bargaining agreement says otherwise. Mr. Russell was a member of the Teamsters. He's on constructive knowledge. That that's a provision in the collective bargaining agreement. He should not have had, he did not have a reasonable expectation that this program would last forever or for any long period of time. Now, a specific, a specific long period of time. Kagan. Does cancel mean that this is, that we don't have to have any reason? We just, you don't have any, we're not making any commitments to you that this is going to be a stable relationship long-term? It was. He's arguing that it was a some sort of undefined specific long-term agreement. And that was everyone's hope. But the fact of the matter was that the leases, as negotiated by the union, and the term in the lease allowed for cancellation. No one, and his claim is a fraud claim. And he's saying that, well, I was told that this was going to be a long-term relationship. Well, certainly that term could not form a duration term of a contract. It's not specific enough. And there's no evidence that Mr. Beggs anticipated. So Mr. Beggs testifies the reason that the program was canceled was because of the recession and the crisis in the car industry. And there's no evidence that Mr. Russell thinks otherwise. And there's no evidence that Mr. Beggs knew at the time that he said this was going to be a long-term relationship that he believed anything other than that. I think everyone hoped that it would be a long-term relationship. PMT had been around for quite some time. But there was an intervening force that caused PMT to have over 100 car haul tractor trailers sitting idle that were company trucks. And so then it was on the precipice of going out of business and it had to make decisions and did so with respect to the leases. Also, there's no evidence that this court should rely on that Mr. Russell supposedly needed a new truck because of the maintenance. His testimony in his deposition was that he decided to upgrade his truck because he thought his truck was a, these are his words, a Toyota, and he wanted a Mercedes. So he bought a more expensive truck because he was making enough money as an owner-operator, three to four times what he was making as a driver, so that he could afford to buy a nicer and a new truck. There also is no evidence that Pacific Motor Trucking Company needed these employees and drivers to buy trucks for them. Instead, Mr. Beggs testified it was a capacity issue. They just had a huge amount of capacity. It takes time to train these drivers because what they have to be able to do, it's not just like a driver of a tractor trailer who delivers freight. These drivers actually drive the car hauler and they load the units and unload the units, and that's a skilled job that they have to be trained to do. It takes a fair amount of time to buy new tractors, to train new drivers, and that was the problem was they had a, they were busting at the seams at the time, according to Mr. Beggs, and that was the reason that he decided to pursue with the president of the company, opening up the owner-operator program. Let me come back now to the first, the fraud claim. The two issues are that there was a statement made regarding the fact that maintenance would occur on these owner-operator trucks as part of the owner-operator program. The second one was that the relationship would be a long-term relationship. I think what's important about the maintenance is that the testimony indicated that there was, in fact, maintenance performed on these owner-operator trucks or on the trucks of owner-operators. It just was not performed on Mr. Russell's truck. Mr. Russell had one incidence of maintenance. He decided not to seek maintenance from the PMT shop, and he never requested maintenance of PMT. The maintenance program did begin, but then it was decided to end the maintenance program. So it wasn't that there was a representation that there's going to be maintenance and then there was not. There was maintenance, and PMT is a unionized shop. The mechanics are also unionized, and I suppose there was an issue about discount, but it was stopped. And I think that shows a different fact pattern than what Mr. Russell wants to characterize it as, which is you said there was going to be maintenance. There was never any maintenance, and that's not correct as far as the facts go. With respect to the issue concerning long-term, I think this one has been fleshed out, but there's no evidence in this case that Mr. Beggs believed anything other than what he said about the longevity of the program. It only made sense that they hoped that it would be a long-term program. They were busting at the seams. Business was going very well, and they wanted to be able to pick up the freight quickly, and so they opened up an owner-operator program. With respect to whether these two issues were material to Mr. Russell, first of all, the maintenance, based on the facts and the record, the maintenance was not material to Mr. Russell because he never requested PMT to maintain the truck when the maintenance program was going on. Similarly, the long-term comment was not material to him because he never asked Mr. Beggs what he meant by long-term. He should have known, according to the collective bargaining agreement, that the PMT had the ability to cancel the lease, and certainly after testifying that he had the 2007 lease for almost a year and a half, that he read through the entire 2007 lease, that when he decided to buy a new truck at the end of 2008, he got the same lease. It was the same document. He signed it up for the 2009 lease. He was full of knowledge of everything that was in the 2007 lease. Can you help me for a minute? What was terminated, the lease? So, yes, the lease was canceled or terminated. There was a notice sent in February of 2009 saying that we're canceling the lease upon 30 days' notice. So that left Russell with the truck. Correct. And the obligations to buy the truck. If he had obligations to continue to pay for the truck, then he would have those obligations, presumably. There was no requirement under the owner-operator program that he buy a truck or that he buy a new truck. He could have bought a used truck, but, yes, he testified that he had a continuing financial obligation. And he had to, and he, so, but he could no longer, and what was his employment relationship? He continued after the cancellation. He continued to drive for PMT, but he just began driving a company truck at that point in time, so he was paid as a driver and not as the lessor. He worked for a period of time. He was injured. He was off of work. He then retired, and then he kept that truck, the 2009 truck, and then he drove it for at least a couple of other companies as an owner-operator, after which there was then an issue about, I think, repossession or foreclosure or something like that. The foreclosure did not occur right after the lease was canceled. It occurred down the road after he had driven that truck for two other, I guess they would be lessees, under their owner-operator programs. So the termination decision is not subject to the arbitration clause? The termination is permitted, and the arbitration clause presumably would apply to the obligations of PMT as a result of the termination, which said you either have to purchase the truck for fair value or assist in selling the truck for fair value. And Mr. Russell, presumably he wanted to keep the truck, and he did, and so he did not seek any grievance of that decision or whether the assistance, or obviously there was no purchase, but there was no grievance of that. Correct. And you waive that? Well, I don't concede that we waived it. At the time that Russell was filed, we did remove to federal district court. The district judge noted that there was an issue concerning whether there was a waiver or not. At that point in time, it was a single case. The PMT moved the case to federal district court, and at that point that was all water under the bridge when the other 14 plaintiffs came down the pike. So this case? Russell is the first case. Russell is the first case, and it was originally filed in state court, and you removed it? Yes, correct. And then the Alvarado case came along with multiple plaintiffs, and it was filed in federal district court? It was filed in federal district court, in the same federal district court. So the federal district judge ruled on the first motion to dismiss, and after one of those rulings they were provided an opportunity to leave to amend the complaint, and after doing so then the Alvarado cases get filed at about that same time period. Does our resolution of this case have any effect on the resolution of the Alvarado case? Yes. Mr. Russell had a unique fact pattern with respect to the ratification issue. So to the extent that the 2009 lease is material to this court's decision, then it may not. To the extent that this court decides general issues related to the 2007 lease or related to the other elements of the fraud claim, it certainly would. Yes, it would suggest that there is some collateral estoppel potentially. But that would have to be, if we were to send the Alvarado case back, that would have to be resolved, I assume, by the district court. I think based on the facts of the Alvarado, each of the Alvarado plaintiffs, even though we took their depositions in the Russell case, presumably there would have to be a fleshing out of those facts. So you're saying that if we went through the whole process in the Alvarado case and the net of it was it goes back to the district court and they get through all the arbitration questions that we seem to be confused about and it ultimately gets to the district court judge, on the summary judgment on the substance of the breach of contract and fraud in the inducement claims, you're saying that the facts of those Alvarado plaintiffs and the defendant line up with the facts of Russell and the defendant? That is my advocacy, yes. But it's not exactly right. There can be some variances because Mr. Russell only attended one meeting in 2006 or 2007 and some of the Alvarado plaintiffs testified that they attended other meetings, so perhaps they heard other things that were said to them before they entered the owner-operator program. So that could be an issue or it might be immaterial and it might be that the fraud claim then would be subject to summary judgment because it's not a material difference, yes. Okay. I don't think we have any further questions, counsel. Thank you very much.  Thank you, Mr. Thatcher. Mr. Crosby. Thatcher indicated that doing the repair and maintenance wouldn't be material to Mr. Russell because Mr. Russell never demanded or asked that the maintenance be done in his truck. But as Mr. Russell stated in his testimony that the reason he didn't was he had already learned that they had terminated any maintenance on the truck, so it would have been futile. So it was material to him and he testified that the ball bearings went out on his truck and he had to have maintenance and he couldn't afford to have continued problems with a truck where the company wouldn't do the maintenance and that's why he bought the second truck. I just like to add a word about the sham affidavit issue that counsel said that under the cases that were discussed in the briefs, the court should apply that only with caution and not try to usurp credibility determinations that are properly in the province of the jury. And when one invokes the sham affidavit, it's saying in effect that you're lying in this affidavit. And I should submit that one of the assertions that they made in support of that argument is that Mr. Russell had said everything that was to be said in response to a question having to do with the second conversation he had when he bought the second truck in 2009 when in fact in that deposition transcript, counsel cut him off when he started to give his answer and asked for further information about that without coming back with the question have you now told me everything that was said in that discussion? And yet he represented to the district judge that that was everything that he had said. So the main issue in this case is long-term partnership and doing maintenance on the truck and it's undisputed that that was said in his deposition. And I just reiterate that the 30-day termination clause not being disclosed and the fact that it's the company's responsibility and knowledge of that presumably before they put somebody out there to promote this program, either they know about that contract or they should know about the opportunity to terminate it on 30 days' notice. They didn't and that is a material omission. Does the record show who wrote the draft of the contract? Well, I'm sure it was written by the company or its lawyers. It wasn't written by the plaintiff. I can represent that. So you've exceeded your time and I think we understand your argument. Thank you very much. Thank you, Mr. Crosby. We thank all counsel for the argument. Russell v. Specific Motor Trucking Company is submitted. With that, we've completed the oral argument calendar for the day and for the week and the Court stands adjourned.
judges: Schroeder, Bybee, Smith